

**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**
*Metropolitan Detention Center*

*80 29th Street*
*Brooklyn, NY 11232*

March 25, 2025

The Honorable Natasha C. Merle
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     **<u>Potential Attorney Misconduct – Jeffrey Chabrowe</u>**
          *USA v. Cronin* (Docket Number 1:24-cr-00303-NCM-1)

Dear Judge Merle:

I am a Staff Attorney representing the Metropolitan Detention Center, located in Brooklyn, New York ("MDC Brooklyn"), and am writing to inform you of a situation involving defense attorney, Jeffrey Chabrowe. Mr. Chabrowe is retained as counsel for Karl Cronin (Reg. No. 00053-506), currently detained at MDC Brooklyn, whose criminal case you preside over under Docket Number 1:24-cr-00303-NCM-1.

On Friday, March 21, 2025, I had several conversations with Mr. Chabrowe that not only cause me to question his professional judgment, but also his ability to effectively advocate for Mr. Cronin in his criminal case. As such, I feel compelled to bring this matter to your attention.

I.     <u>Timeline of Events</u>

On Thursday, March 20, 2025, AUSA James Simmons raised issues with the Legal Department pertaining to Mr. Cronin's medical care that were brought to his attention by Mr. Chabrowe. After some discussion, Mr. Chabrowe and I scheduled a phone call for the following morning to discuss these concerns, which specifically relate to a skin condition.

a.   *Initial Conversations with Mr. Chabrowe*

The first conversation occurred at approximately 9:00 a.m., on March 21, 2025. While describing the physical appearance of Mr. Cronin's condition, Mr. Chabrowe informed me that his "client sent me [Mr. Chabrowe] photographs" of himself that Mr. Chabrowe acknowledged he "should not have," and further offered to forward them to me. Following that admission, the line went dead; Mr. Chabrowe quickly followed up via email to apologize, and stated he will call me right

back.

When Mr. Chabrowe called me back, we continued the conversation, where he again referenced the photographs that his client had sent him. At this time, I requested Mr. Chabrowe forward the pictures, as he originally offered, as I believed they would be helpful for me to get a better understanding of his position and enable me to further discuss Mr. Cronin's care with MDC Brooklyn's clinicians. After this conversation, I spoke with our clinicians to request they re-evaluate Mr. Cronin for this skin condition.

I followed up with Mr. Chabrowe via email to request the photographs of his client but never received a response.

### b. *MDC Investigation of Potential Contraband*

Separate from the core issue of Mr. Cronin's medical condition, this conversation led me to believe Mr. Cronin was in possession of a contraband cellphone. MDC Brooklyn does not provide detainees with any equipment that would enable them to take or send photographs from inside of the institution – to do so would present a safety and security risk. But for a contraband cellphone, there is no viable way for Mr. Chabrowe to be in possession of the photographs that he received *from* Mr. Cronin.

Contraband cellphones pose a significant threat to the safety of correctional staff, detainees, and the public, alike. As such, I was obligated to report my suspicions internally to members of our operational staff to investigate a potential violation of Bureau of Prisons ("BOP") policy. I reported the conversation to  .

At around 1:15 p.m., I relayed the specific details of my conversation with defense counsel to our Lieutenant, ███████████████████████, who ultimately echoed my suspicion. By approximately 1:30 p.m., our Lieutenant called to advise me he just concluded an interview of Mr. Cronin, who had since been escorted back to his housing unit.

I was informed Mr. Cronin denied sending Mr. Chabrowe photographs or having a contraband cellphone in his possession. He claimed he met with his attorney for a legal visit the day before and showed him the condition in person. Mr. Cronin was reinformed of BOP's prohibition against such an item and the repercussions should we obtain the photographs from Mr. Chabrowe, which at minimum, could include disciplinary segregation in SHU.

### c. *Subsequent Communication with Mr. Chabrowe*

Less than ten minutes after Mr. Cronin was interviewed by our Lieutenant, at 1:37 p.m., I received

an email from Mr. Chabrowe stating MDC Staff "just took [Mr. Cronin] to the SHU saying he's taking pictures." Within moments of that email, Mr. Chabrowe called me to express his discontent with the information he received. From the outset, Mr. Chabrowe was defensive and accused me of acting inappropriately by reporting his client for potentially having a contraband cellphone, stating that he "thought [he] could trust [me]" with the information he provided and no longer believed I cared about his client's medical needs.

Almost verbatim, I advised Mr. Chabrowe that as an attorney for MDC Brooklyn, he can trust I will do my job, which includes ensuring all detainees receive humane treatment and medical care. This is their Constitutional right, which I take very seriously. However, I further explained that I cannot ignore information that creates the reasonable suspicion a detainee may be in possession of contraband – to do so could threaten the safety and security of my colleagues, other detainees, and the public.

I confronted Mr. Chabrowe on whether the information he provided during our earlier conversation was false; and explicitly asked, "did you not say that you received photographs directly from your client?" I further reminded him that he also acknowledged he "should not have these photographs," and had offered to send them to me multiple times – leaving me with zero doubt these photographs exist. I explained that from these statements, it was reasonable for me to infer he received photographs from Mr. Cronin using a contraband cellphone, which I was then obligated to report.

Instead of denying the validity of his earlier statements – presumably because to do so would be a lie – Mr. Chabrowe went on to defend the use of contraband cellphones, claiming they are essentially a necessary evil and provide a public benefit to enable detainees to inform members of the community about the realities of incarceration. While I found these statements alarming, my greater concern was with validity of the information Mr. Chabrowe received concerning his client's placement in SHU, the source of that information, and the means through which that information was relayed.

Given my continued suspicion that Mr. Cronin has access to a contraband cellphone on his housing unit, I asked Mr. Chabrowe how he learned about the investigation and why he believed his client was moved to SHU. He stated, "other inmates on the unit" called to tell him; this immediately prompted me to question whether the call he received originated from the BOP telephones available to detainees on the housing unit or the same contraband cellphone his client presumably used to send him the photographs. Mr. Chabrowe stated it came from the housing unit phone, a claim which is easily verifiable.

The conversation ended with Mr. Chabrowe asking me in earnest whether I "really believe he is going to send the photographs now." Although it likely goes without saying, to date, I have not received these photographs.

II.     My Investigation into Mr. Chabrowe's Claims

As an attorney for the institution who is also trained in correctional practices, I have personal knowledge of BOP policies governing inmate communications, the means through which these

communications are made, and the systems in place used to track, record and catalogue calls made by detainees. As such, Mr. Chabrowe's statement, that he received a call from detainees on the unit using the unit phone, is easily verifiable.

a.  *Mr. Chabrowe's Claim He Communicated with Other Detainees Using the Housing Unit Phone*

With a reasonable amount of certainty, I believe the call Mr. Chabrowe alleges he received from inmates on his housing unit originated from a contraband cellphone. There are three permissible ways detainees can place calls to their attorneys. The first, is the secure, unmonitored Federal Defender phone, that only dials directly to the Federal Defenders' office. Mr. Chabrowe is not a Federal Defender, so the call could not have been made using this line. Second, detainees can submit an Inmate Request Form to any member of their Unit Team to arrange for an unmonitored, fifteen-minute phone call with their attorney. I spoke with Mr. Cronin's Unit Team and confirmed that no Inmate Request Form was submitted.

Lastly, detainees can place phone calls using the social phones located on their unit. These calls operate on Trufone, a BOP system used to track, monitor and record communications. Detainees are provided a confidential Phone Access Code ("PAC") used to access Trufone and can only place calls to phone numbers that are on their approved contact list. Detainees can add up to thirty approved numbers on their contact list, which they manage on Trulincs, the BOP computer system offered to detainees. When adding numbers to their contact list, detainees add the recipient's name, contact information, and their relationship, which is then verified and approved by Unit Team before detainees are able to place calls. When an attorney is added to the detainee's contact list, their status as an attorney is verified. While all calls placed through Trufone are subject to recording and staff monitoring, staff are instructed not to listen to calls placed when the recipient is labeled as "attorney," to maintain attorney-client privilege.



Phone calls made using Trufone are tracked ████████████████████████████████
████████████████████████████████████ (the "Report"), ████████████████████████
████████████████████████████████

As noted, above, detainees may only place calls to individuals already on their pre-approved contact list. It is highly unlikely that in the duration from when Mr. Cronin was taken to the Unit Team office to be interviewed, to the time when Mr. Chabrowe first emailed me, that a detainee would have been able to add Mr. Chabrowe to their contact list (approximately 20 minutes, at most), have that contact approved, and place the subsequent call. Irrespective, that call would be cataloged on the Report.

I met with a member of our ████████████████████████████████████████████████
████████████████████████████████████████████████. A true and accurate copy

---

[1] For privacy purposes, I have not included Mr. Chabrowe's phone number in this letter. However, the number

that Report is included as an attachment to this letter. On March 21, 2025, one call was placed to Mr. Chabrowe using Trufone; notably, that call took place at 5:30 p.m., hours after Mr. Chabrowe and I spoke, and was placed by a detainee housed on an entirely separate floor from Mr. Cronin.

As no call was placed to Mr. Chabrowe utilizing the three means MDC Brooklyn offers detainees, I have no choice but to the call he received was made using a contraband cellphone. Moreover, before any call is connected, call recipients are greeted with an automated message that informs them the call is from an MDC Brooklyn detainee, will be recorded and subject to monitoring by staff, and requires the recipient accept the call. Mr. Chabrowe has received phone calls from detainees using Trufone multiple times in the past and would certainly know the difference between a call received utilizing the unit phone versus a contraband one.

        b.  *Mr. Chabrowe's Claim Regarding Mr. Cronin's SHU Placement*

The information Mr. Chabrowe provided to me both via email and over the phone was also false, as Mr. Cronin was never taken to SHU. That aside, Mr. Chabrowe's knowledge that his client was placed in SHU because of pictures, leads me to believe the call was placed by Mr. Cronin, and not "other detainees," as defense counsel claims.

At the time Mr. Cronin was pulled from his unit and escorted to the Unit Team Office, no other detainee would have been privy to this information to enable them to report it to Mr. Chabrowe. Detainees are frequently pulled off their housing unit for several reasons, many of which are unrelated to placement in SHU for administrative detention or disciplinary purposes.

Additionally, the interview was conducted in private, with no other detainees present to learn details of the investigation. As such, it is highly unlikely other detainees could have suspected he was being moved to SHU let alone "because of pictures" as Mr. Chabrowe knew. This is information that only Mr. Cronin, alone, learned at the time he was interviewed by the Lieutenant.

Even if Mr. Cronin was moved to SHU based on the interview conducted by the Lieutenant, which he was not, detainees on Mr. Cronin's unit still would not have been aware of that until much later, let alone the reason why. Depending on the information revealed during the interview, Mr. Cronin would have been escorted directly to SHU from the Unit Team office. He would not have been permitted to first return to his unit, and therefore able to alert anyone of his movement or the reason why he was subject to the disciplinary segregation.

Ultimately, the only viable way for Mr. Chabrowe to have received the information he had in the

---

utilized in the Truview search is the phone number in Mr. Chabrowe's email signature and is the same phone number I both placed calls to and received calls from Mr. Chabrowe. I additionally viewed Mr. Cronin's approved contact list, which has the same phone number listed for Mr. Chabrowe, listed as Mr. Cronin's attorney. Lastly, MDC Brooklyn works in conjunction with the Federal Defenders to offer pre-scheduled, unmonitored legal calls to detainees, using the Skedda system. When scheduling remote legal calls, defense attorneys provide their name and phone number. The Federal Defenders then generate the call schedule, which they send to MDC Brooklyn's legal department, daily. I randomly selected various call logs where Mr. Chabrowe had calls scheduled with several detainees, all listed the same phone number that was searched on ███████.

timeframe it was received, is that the call came from Mr. Cronin on a contraband cellphone immediately following his interview. While Mr. Chabrowe, alone, can confirm this, I believe Mr. Cronin likely called Mr. Chabrowe to instruct him not to send the photographs, knowing they would likely result in disciplinary action being taken against him.

As Mr. Cronin was released back to his housing unit, he had the ability and tools to contact Mr. Chabrowe using Trufone. However, because all communications using Trufone are recorded and subject to staff review, any call made by him may have also opened him up to disciplinary action.

    III.    <u>Mr. Chabrowe's Potential Misconduct</u>

I acknowledge and appreciate that Mr. Chabrowe cannot control the means through which his client's initiate communication and that there is always a risk detainees will use contraband cellphones to communicate with their attorneys. However, it is ultimately Mr. Chabrowe's reactions as an attorney that cause me to question not only his judgment and ethics, but his ability to effectively continue his representation of Mr. Cronin.

Contraband cellphones not only violate criminal law but pose a significant threat to the safety, security and orderly operation of prisons, nationally. Further, they indisputably threaten the safety of the public. While it is a problem for a detainee to have one, I find it morally reprehensible that an attorney may not only be aware that his client is utilizing a contraband cellphone but actively continues to communicate with a client on a contraband cellphone.

As a criminal defense attorney, Mr. Chabrowe is certainly aware of the disciplinary repercussions associated with a detainee's use and possession of a contraband cellphone and the penalties that can flow from that infraction. To the extent a detainee is physically caught with a cellphone, the data could be extracted by the FBI and used in furtherance of their criminal case, resulting in additional charges being brought and/or time added to their sentence.

Knowing that MDC Brooklyn staff were investigating Mr. Cronin for possession of contraband based on the information he provided, Mr. Chabrowe conceivably took steps to mitigate any disciplinary consequence that would flow had the photographs been sent. In an effort to conceal his client's ongoing and prohibited – if not criminal – conduct, I believe Mr. Chabrowe made material misrepresentations regarding the source of his information, as well as the means through which that information was communicated.

    IV.    <u>Conclusion</u>

I write to you not only as a representative of MDC Brooklyn, but as a fellow member of the Bar who took an oath to uphold the Constitution and justice system. While it brings me no pleasure to lodge such accusations against a fellow attorney, out of respect for my personal conscience, my peers in the legal profession, and to preserve the public trust placed in attorneys to exemplify the highest standards of professional conduct, I am compelled to disclose actions that I believe go beyond the pale of zealous representation of one's client and likely amount to blatant misconduct.

At minimum, I believe Mr. Chabrowe's actions raise questions regarding his personal and legal judgment, including whether he can continue to effectively advocate for Mr. Cronin, that warrant your Honor's awareness and consideration.

Should the Court request any additional information, I am available to discuss.

Respectfully submitted,

/s/ *Rachel K. Kull*
**Rachel K. Kull, Esq**.
Federal Bureau of Prisons
*CLC New York*
MDC Brooklyn | MCC New York | FCI Otisville
80 29th Street
Brooklyn, New York 11232
**P**: (718) 840-4200 ext. 4745
**E:** rkull@bop.gov

/ Enclosures